UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LaMONT G. BAILEY, et al, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | 1:94-cv-89-SEB-JMS |
| vs. ) | |
| ) | |
| E. MITCHELL ROOB, JR., et al, ) | |
| ) | |
| Defendants. ) | |

**ENTRY ADDRESSING MOTIONS FOR SUMMARY RULING**

(Docket No. 69 & 73)

This cause comes before the Court on the Motion for Summary Ruling [Docket No. 69] filed by Plaintiffs on October 29, 2007, as well as the Motion for Summary Ruling [Docket No. 73] filed by Defendants on December 28, 2007. In their Motion, Plaintiffs contend that Defendants have violated a consent decree approved by this Court and should therefore be held in civil contempt and enjoined to follow the mandates of that decree. In their Motion, Defendants urge that they have not violated the consent decree and that Plaintiffs do not have standing to bring their claim. For the reasons detailed in this entry, Plaintiffs' Motion is <u>DENIED</u>, and Defendants' Motion is <u>GRANTED</u>, although this ruling does not foreclose Plaintiffs' claims altogether.

## *Background Facts*

*A. The Medicaid Disability Application System*

A brief review of the disability application process in Indiana is useful for an understanding of the present dispute. When an individual applies for assistance from the Medicaid for the Disabled program in Indiana, she is assigned a caseworker, who manages the application. Pl.'s Br. in Supp. at 4. The caseworker compiles, along with other documents, Form 251B, in which the applicant reports her conditions and any information regarding medical treatment in the last twelve months, including the identification and location of the sources of that treatment. See Dep. of Yann at 12. Based on this information, the caseworker is responsible for collecting the applicant's medical history covering the twelve months preceding the application date. Id. If the caseworker cannot obtain this information after a diligent search, including further contact with the applicant, then this lack of information is to be noted on the application packet that the caseworker forwards to the Medicaid Medical Review Team ("MMRT" or "board"). Id. at 24. This board, which makes the disability determination, is responsible for collecting any and all relevant medical information that was not collected by the caseworker. Dep. of O'Neill at 7.

The medical history collected from the applicant's treatment sources, whether it is obtained by the caseworker or the board, is often incorporated into Form 251A, which is completed by the applicant's treating physician or physicians. This form summarizes the treatment and diagnosis of the applicant. Form 251A requires the following of the treating physician: (1) "Please list all diagnostic tests and/or evaluations performed on the

patient and their results"; (2) "Please list all treatments performed to-date relative to his/her impairment(s)"; and (3) "What are the patient's current medications including dosage and frequency?"  Pl.'s Exhibit 1 at 8.  The form also requests further details about a number of specific ailments.  Id. at 8-11.  Central to the present dispute is the common practice of using this form as a substitute for providing the applicant's medical records in detail.  If the medical history contained in the application packet is complete, the board is able to determine properly and accurately whether the applicant suffers from a disabling condition necessitating Medicaid assistance.

*B. The Present Cause of Action*

On July 24, 1996, the Court approved a Stipulation to Enter Consent Decree ("Consent Decree"), in which Defendants, who manage Indiana's Medicaid disability application program, agreed to obtain and evaluate certain evidence in the process of determining disability status for Medicaid applicants.  Pl.'s Br. in Supp. at 1.  The Consent Decree conformed the obligations it imposed upon Defendants to those imposed by federal law,[1] including the requirement that Defendants obtain medical histories of applicants covering at least twelve months preceding the month in which the applicant filed for Medicaid benefits.  Id.  Also in accordance with federal law, the Consent Decree imposed upon Defendants an obligation to obtain additional medical information from the

---

[1] "Pursuant to 42 C.F.R 43.541, the State of Indiana must obtain and evaluate evidence in determining Medicaid eligibility in the same way that Supplemental Security Income disability determinations are made under 20 C.F.R. 416.901 through 416.988 . . . ."  Consent Decree at I.1-2.

applicant's physician, psychologist, or other medical source when such information is necessary to make a proper determination of disability.  Id.

On April 13, 1999, Plaintiffs filed a Verified Petition to Hold Defendants in Contempt of the Consent Decree.  The parties settled that dispute with a second consent decree, in which the Defendants again agreed to meet their obligations under the Consent Decree[2] and further consented that applicants who had been denied Medicaid disability benefits in the three years prior to that agreement could reapply for those benefits.  Id. Nothing in either consent decree amounted to an admission by Defendants of wrongdoing.  Each merely constituted a prospective obligation binding Defendants.  See Def.'s Br. in Supp. at 4.

On September 26, 2006, nearly seven years after entry of the second consent decree, Plaintiffs filed a second Verified Petition to Hold Defendants in Contempt of the Consent Decree, alleging that Defendants were still failing to comply with the decree approved by the Court and the federal regulations incorporated therein.  Pl.'s Br. in Supp. at 1. On November 30, 2006, Defendants, in response to a discovery request by Plaintiffs, agreed to produce a sample of Medicaid disability benefit applications from the calendar year 2006.  Def.'s Br. in Supp. at 1.  That sample consisted of all Marion County applicants whose last names began with "C" and whose applications were denied between

---

[2]This consent decree reiterated the sections of the Code of Federal Regulations that Defendants were required to follow and expressly provided that this included "obtaining complete medical histories from Medicaid disability applicants' medical sources covering at least the 12 months preceding the month in which the applicants apply before making Medicaid disability determinations . . . ."  Second Consent Decree at 1.1.

September 1, 2006 and October 1, 2006.  Id.  This sampling produced a total of twenty-six files, twelve of which were deemed by the parties to be complete and sufficiently detailed.  Def.'s Br. in Supp. at 2.

Plaintiffs filed their Motion for Summary Ruling on October 29, 2007, contending that the remaining fourteen applications were not "complete" under the standards set out in the Consent Decree and that Defendants should therefore be held in civil contempt and enjoined to manage the Medicaid disability benefit plan in a way that conforms to the Consent Decree and its incorporated federal regulations.  Defendants responded with their own Motion for Summary ruling, asserting that Plaintiffs have failed as a matter of law to meet their burden under the contempt standard.

## *Legal Analysis*

### I.  *Injury and Mootness*

Defendants urge two legal arguments against Plaintiffs' claim that are best addressed here, at the outset of this entry.  The first is that Plaintiffs have not demonstrated the injury necessary to state a claim; and the second is that Plaintiffs' claims are moot.  Both arguments are legally defective and therefore do not act to bar Plaintiffs' claims.

1. The Harm Suffered by Plaintiffs

Defendants argue that "Plaintiffs have not presented evidence of a single instance where a Medicaid applicant has been harmed because of the Defendants' actions."  Def.'s

Br. in Supp. at 7. There are two layers in Defendants' injury argument: first, that Plaintiffs must show harm to overcome the civil contempt standard; and second, that Plaintiffs were not harmed. It is true, as this argument implies, that civil contempt provides courts a tool with which to compensate parties for the harms they have suffered. See Thompson v. Cleland, 782 F.2d 719, 721 (7 Cir. 1986). It is more broadly true, however, that "civil contempt . . . may . . . be employed for either or both of *two purposes*: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." U.S. v. United Mine Workers, 330 U.S. 258, 303-304 (1947) (emphasis added). In fact, the authority Defendants cite, Thompson, quotes this very phrase from United Mine Workers. See id. Because Plaintiffs may state a claim by showing harm or by seeking to coerce of Defendants into compliance, and because they base their claim on both of these purposes, Defendants' argument fails.

The second layer of Defendants' argument is that there was no harm to any of the Plaintiffs who failed to exhaust state administrative remedies and opportunities to appeal the denials of their applications. Because those remedies are available, and because no harm can be demonstrated without first exhausting those remedies, Defendants argue, Plaintiffs cannot present a cognizable claim. While it is true that the Indiana Code provides many administrative remedies to Medicaid disability applicants,[3] it is also an established principle that a plaintiff need not exhaust administrative remedies before

---

[3]The applicant may appeal the initial decision to the Office of Medicaid Policy and Planning, for instance. Ind. Code §12-15-28-1.

bringing a claim under 42 U.S.C. §1983, which was the original legal basis for Plaintiffs' cause of action. See Ellis v. Dyson, 421 U.S. 426, 432 (1975); see also Second Amended Complaint at ¶4. Defendants' argument that Plaintiffs are foreclosed from showing harm is therefore unavailing. Both layers of Defendants' harm argument fail because both rest on legally incorrect foundations.

2. Mootness

Defendants' mootness arguments are similarly faulty. They contend that Plaintiffs' case is moot because the claims of the named plaintiffs have been resolved properly. They point out that the application of one of the named plaintiffs, Elizabeth Shue, has already been "properly processed" with "all required medical records," and that the application of the other named plaintiff, Linda Jefferson, "has already been approved." Def.'s Br. in Supp. at 16. This argument is contrary to the longstanding principle described in Sosna v. Iowa: the mooting of a named plaintiff's claim does not moot the class claim, "since the controversy remains very much alive for the class of unnamed persons whom she represents and who, upon certification of the class action, acquired a legal status separate from her asserted interest." 419 U.S. 393, 393 (1975). Defendants argue that despite this rule, "the fact that the two named plaintiffs in the instant case do not have a live case or controversy is relevant to the contempt action." Def.'s Br. in Supp. at 17. This argument–that we take note of the mootness of the named Plaintiffs' claims–is irrelevant in light of the principle set out in Sosna and to our assessment of mootness. Accordingly, Defendants' argument is unavailing.

As a further mootness argument, Defendants contend that the Medicaid disability application program is undergoing major improvements. These improvements include efforts to train caseworkers more thoroughly and to remind them regularly of the requirement that they compile twelve-month medical histories for each application. Defendants have also hired two quality control nurses, whose "duties include coordinating, supervising, and monitoring administration of Quality Control for MMRT" and developing "quality measurements and program outcomes." Def.'s Br. in Supp. at 12.

Moreover, Defendants urge that they "are currently in the process of modernizing the way that applications for benefits, including Medicaid disability, are processed." Id. at 13. This argument refers to the recent move by the State of Indiana to privatize the Medicaid application system. The State contracted with "an IBM-led coalition" in order to "modernize" the application system by creating various new positions, including consultants. Id. The State has also implemented new technologies and streamlined the application process by consolidating services to eight centers throughout the state. Id.

This privatization, according to Defendants, has occurred in phases and culminated only very recently. Id. Therefore, the effects are not yet readily apparent in any reliable statistical form, but Defendants appear confident that this new system will substantially move the Medicaid application process toward what Plaintiffs are asking for (and in line with the dictates of the Consent Decree). According to Defendants, these improvements to the overall system effectively moot Plaintiffs' claims. However, as Plaintiffs correctly assert, this privatization does not moot the present cause because of the established

principle that "voluntary cessation of . . . illegal conduct does not deprive the tribunal of power to hear and determine the case." U.S. v. W.T. Grant Co., 345 U.S. 629, 632 (1953). The privatization undertaken by Defendants amounts to a voluntary cessation of alleged wrongdoing, and we, therefore, hold that it does not moot Plaintiffs' claims.

## *II. Civil Contempt*

The Seventh Circuit's standard for when a court may hold a party in civil contempt is clear:

> To win a motion for civil contempt, a party must prove by clear and convincing evidence that the opposing party violated a court order. The district court must be able to point to a decree from the court which sets forth in specific detail an unequivocal command which the party in civil contempt violated.

Goluba v. Sch. Dist. Of Ripon, 45 F.3d 1035, 1037 (7th Cir. 1995) (internal citations omitted). A court may "find a party in civil contempt if that party has not been reasonably diligent and energetic in attempting to accomplish what was ordered." Id. Moreover, as mentioned in our discussion of harm, "civil contempt . . . may . . . be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." U.S. v. United Mine Workers, 330 U.S. 258, 303-304 (1947).

## *A. The Consent Decree*

Neither party disputes either the existence of or the terms of the Consent Decree

entered previously by the Court in this case. The first Stipulation to Enter Consent Decree ("Consent Decree") directed Defendants to obtain and evaluate medical information for the purpose of making Medicaid disability determinations in accordance with 42 C.F.R. §435.541 and 20 C.F.R. §§416.901 through 416.988. This directive imposed three substantive requirements on Defendants: (1) "obtaining *complete* medical histories from Medicaid disability applicants' medical sources covering at least the 12 months preceding the month in which applicants apply before making Medicaid disability determinations," Consent Decree at 1.1 (emphasis added); (2) obtaining additional medical information from an applicant's treating physician or other medical source when such additional information is necessary, 20 C.F.R. §416.912(e); and (3) ensuring that the medical records obtained are "*complete* and detailed enough to allow" for a proper determination regarding disability, 20 C.F.R. §416.913(e). Consent Decree at 1.1 (emphasis added). The dictates of this decree and the federal regulations that inform those dictates constitute the substantive law under which Defendants' management of the Medicaid disability application system is to be judged.

*B. Factual Contentions*

Plaintiffs contend that Defendants should be held in civil contempt because they failed, and continue to fail, to act with reasonable diligence in attempting to comply with both consent decrees. Evidence in support of this allegation is drawn from the sampling of twenty-six denied applications, and Defendants' failures allegedly come in two forms: (1) failure to compile and use "complete" medical histories of Medicaid applicants for the

period of twelve months preceding the applicants' filing date; and (2) failure to guarantee that the medical information obtained by caseworkers is "complete and detailed enough" to provide for an accurate determination of disability.  Pl.'s Br. in Supp. at ii.

In seeking to prove these allegations, Plaintiffs provide both a summary of statistics drawn from the random sample and a detailed review of each of the allegedly deficient applications.[4]  Plaintiffs' factual allegations, which are drawn directly from a numerical assessment of the random sample of twenty-six, include the following: (1) In nine, or 35%, of the applications, Defendants failed to request twelve-month medical histories; (2) in seven, or 25%, of the applications, Defendants failed to collect information that was "complete and detailed enough" to make a disability determination; (3) in three, or 12%, of the applications, Defendants failed to collect a list of any medical facilities that treated the applicant; (4) in eight, or 53%, of fifteen applications,[5] the county office forwarded the application to the MMRT without any medical records; (5) in four, or 27%, of fifteen applications, the Medicaid application was denied on the same day that the Medicaid Medical Review Team requested additional information about the

---

[4]Defendants state in passing that they "also move the Court to strike the Plaintiffs Summary of Conclusions Drawn from Random Sampling" because they are "inaccurate, misleading, and exaggerated." Def.'s Br. in Supp. at 7.  The Court cannot identify what part of Plaintiffs' Brief Defendants target with this assertion, but in any case, "[t]he way to point out errors in a . . . brief is to file a reply brief, not to ask a judge to serve as editor."  Custom Vehicles, Inc. v. Forest River, Inc., 464 F.3d 725 (7th Cir. 2006).  Moreover, none of Plaintiffs' arithmetical conclusions used in this entry is improper.  Defendants' argument is therefore unavailing.

[5]By agreement of the parties, Plaintiffs received documents concerning requests for additional medical information for only fifteen of the twenty-six applications.  Entry of March 6, 2007 [Docket No. 52].  Therefore, the data and conclusions to be drawn are limited to a sample of fifteen with regard to cases in which additional medical information was requested.

applicant; (6) in one of fifteen applications, the only medical information included in the application was gathered by a registered nurse, rather than a doctor; (7) in none of the applications did the packet contain Form 2032, which is supposed to be present any time an applicant was asked to receive a physical examination; (8) in none of the applications did the county caseworker make a record of requests for medical information; and (9) in neither of the two applications in which a physician requested that the applicant receive further testing was the testing actually performed before the application was denied. Pl.'s Br. in Supp. at 2-3.

Because of these alleged deficiencies, Plaintiffs urge that: (1) Defendants "should be enjoined to contract with an outside consultant . . . who shall perform an independent audit of a random sampling of . . . Medicaid denials every three months for a period of five years"; and (2) Defendants "should be permanently enjoined to record each and every instance in which a request for medical information is sent to an applicant and/or his provider(s)." Id. at 42. Pursuant to these mandatory injunctions, the Plaintiffs aspire to have the Court establish compliance benchmarks, including that within a year "Fewer than 1% of all Medicaid denials contain insufficient medical information." Id. at 43.

Defendants respond that this benchmark is not reflective of "reasonable diligence" but instead sets the standard only a little short of perfection, making it "impossible" to achieve. Def.'s Br. in Supp. at 5-6. Defendants also summarily reject Plaintiffs' factual allegations and statistical conclusions. They argue that they have not violated the twelve-month standard because they "have procedures in place to ensure that 12 months of medical records are collected," Def.'s Br. in Supp. at 10 (although they do not adduce

facts to show the effectiveness of these procedures).

Both parties also discuss at length each of the allegedly deficient applications, and they dispute many material facts related to these applications. A general review reveals that Defendants usually made an effort to collect medical records, but in some cases, they neglected to collect records from more than one source of medical treatment, even though applicants listed multiple sources in their applications. The facts also indicate that Defendants often relied on summaries of medical information provided in Form 251A as a "complete" history, rather than compiling separately the applicant's actual medical records. See Pl.'s Br. in Supp. at 24-36.

Our detailed review of the applications brings us to the following conclusions. Five allegedly incomplete applications, B, C, J, K, and N, were in fact complete and therefore in compliance with the terms of the Consent Decree and with the federal regulations. The evidence adduced shows that documentation covering all medical sources was gathered and used by the board, and the physicians completing the 251A form or providing the applicant's medical records, as well as the caseworkers assigned to the applicants, acted in good faith in compiling the applicant's medical history. Therefore, whatever the definition of "complete" is, these applications were complete because they contained the relevant supporting documentation. Short of the full collection of relevant medical records found in these five cases, however, we cannot say with certainty what actually constitutes a "complete" application. Thus, nine applications remain under review in which the definition and degree of completeness remain unclear.

Four of these nine applications are clearly less complete than the other five: M, in

which the medical "records" included only a prescription refill; E, in which even the summary 251A form was missing pages; L, in which only one source produced a 251A form and that form was incomplete; and H, in which the applications were denied on the same day that further records were requested (and never received) by the board.

In the remaining five applications, a complete and detailed Form 251A was included in the board's review, but supporting medical records were either scant or missing entirely.  These applications present the Court with a mixed question of law and fact: whether Form 251A, completed in its entirety by the applicant's medical sources, provides a "complete" and proper review of the applicant's medical history for the purpose of making a disability determination. The parties have not sufficiently clarified whether these nine applications contained "complete" medical histories under the federal regulations that were incorporated into the Consent Decree because the definition of "complete" remains unsettled.

*D. Plaintiffs Have Not Met Their Burden*

Under the civil contempt standard, the remaining question before us is whether Plaintiffs have shown, by clear and convincing evidence, that Defendants have not been "reasonably diligent and energetic in attempting to accomplish what was ordered" in the Consent Decree.  In other words, to comply with the Consent Decree and avoid a finding of contempt, Defendants must have been reasonably diligent in compiling the "complete" medical histories of applicants, whatever that means.

Unfortunately, neither party has presented conclusive evidence regarding the

definition of "complete."  Plaintiffs presented no expert testimony or administrative evidence, but they urged the definition of "complete" found in the relevant federal regulations:  "'the records of [the applicant's] medical sources covering' at least the twelve (12) months preceding the application date."  Pl.'s Reply at 13 (quoting 20 C.F.R. §416.912(d)(2)).  While it is clear that Plaintiffs believe "complete" to indicate a full collection of the medical records themselves, this definition is simply too vague, compelling further evidence in order to clarify its meaning.  In Defendants' view, Medicaid disability Form 251A, which provides a seven-page summary of medical evidence and is completed by a physician, is sufficient to provide a "complete" medical history for a determination of disability.  They repeat this contention numerous times when describing each of the allegedly deficient applications in detail.  <u>See id.</u> at 20.  This form does not, however, include or contain an applicant's actual "records," as may be required by the definition Plaintiffs offer.  Moreover, Defendants produce little to support their viewpoint.  Accordingly, it remains unclear to us what, short of an exhaustive compilation of medical records and Medicaid forms, is sufficient to constitute "complete" medical history under the controlling standard.

   The evidence adduced in the random sample of twenty-six denied applications outlines three groups of applications: first, five unmistakably "complete" applications for which full records were used; second, four arguably incomplete applications, in which something less than full records was used; and third, five applications in which Form 251A was used and represented a summary of the applicant's medical history from all sources.  Plaintiffs have failed to meet their burden under the contempt standard for the

first set of five applications because their completeness shows "reasonable diligence" on the part of Defendants to follow the Court's order and the regulations that support it. Moreover, because it remains unclear what constitutes a "complete" medical history, Plaintiffs also have failed to meet their burden on the remaining applications, because the standard for contempt requires clear and convincing evidence that Defendants violated the decree. Their Motion for Summary Ruling, having failed to meet its burden, must therefore be denied.

That said, we hasten to note that our ruling may not be the last word, foreclosing Plaintiffs' claims entirely and forever. Because the amount and type of medical information needed for the proper management of the process is disputed, further evidence is necessary. Expert testimony, or information on how the agency charged with responsibility for compliance with the Decree interprets the definition Plaintiffs offer, would inform our understanding of whether the applications that included only Form 251A, or the other applications that were otherwise less than comprehensive, are "complete" enough to conform to the Consent Decree. Furthermore, we require a factual explication of what precisely the Medicaid system instructs physicians to do and take account of in completing Form 251A. Further clarification is also needed regarding what caseworkers are obligated to do to create a complete application. Therefore, Plaintiffs may wish to renew their request for an order of contempt if they are able to buttress that request with the referenced corroboration. We repeat: the parties must be prepared to present full, clear and convincing evidence, which may be expert, administrative, statutory, or otherwise, regarding the processing of the allegedly defective applications

that comprise the record in this cause as well as the proper definition and interpretation of the term "complete" found in the federal regulations that inform the standards set forth in the Consent Decree. For now, Plaintiffs' request must be denied.

### III. Conclusion

For the foregoing reasons and on the evidence adduced, Plaintiffs have failed to establish by clear and convincing evidence that Defendants violated the Consent Decree. Should additional evidence be adduced to clarify or establish the meaning of "complete" as regards the medical information necessary to make a proper disability determination, as well as to clarify the procedures regarding the management of the application process, specifically the instructions given to the caseworkers and physicians who collect applicants' medical histories, Plaintiffs may seek to renew their request for further review by the Court. Plaintiffs' Motion for Summary Ruling is <u>DENIED</u>, and Defendants' Motion for Summary Ruling is <u>GRANTED</u>.

Date: ___09/30/2008___

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Clifton Boyd Cislak
INDIANA OFFICE OF THE ATTORNEY GENERAL
clifton.cislak@atg.in.gov

Melinda C. Frick
INDIANA OFFICE OF THE ATTORNEY GENERAL
lfrick@atg.state.in.us

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Jacquelyn Bowie Suess
ACLU OF INDIANA
jsuess@aclu-in.org